E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Chief, Major Frauds Section
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2432
Facsimile: (213) 894-6269
E-mail: poonam.kumar@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ZE'SHAWN STANLEY CAMPBELL,

Defendant.

No. CR 21-99-MCS

GOVERNMENT'S SENTENCING POSITION; MEMORANDUM OF POINTS AND AUTHORITIES

Hearing Date: March 27, 2023
Hearing Time: 3:00 p.m.
Location: Courtroom of the Hon. Mark C. Scarsi

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Ranee A. Katzenstein, hereby files its Sentencing Position for defendant ZE'SHAWN STANLEY CAMPBELL in this matter.

//

//

//

//

This Sentencing Position is based upon the attached memorandum of points and authorities, the Presentence Investigation Report, the Victim Impact Statements lodged separately under seal, the files and records in this case, and such further evidence and argument as the Court may permit.

| Dated: March 17, 2023 | Respectfully submitted,<br><br>E. MARTIN ESTRADA<br>United States Attorney<br><br>MACK E. JENKINS<br>Assistant United States Attorney<br>Chief, Criminal Division<br><br>/s/ Ranee A. Katzenstein<br>RANEE A. KATZENSTEIN<br>Assistant United States Attorney<br>Chief, Major Frauds Section<br><br>Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |
|---|---|

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ....................................ii

I. INTRODUCTION..........................................1

II. DEFENDANT'S SCHEME TO DEFRAUD........................2

III. THE PSR AND DEFENDANT'S SENTENCING GUIDELINES RANGE............6

IV. THE COURT SHOULD IMPOSE A SENTENCE OF 71 MONTHS' IMPRISONMENT.............................................7

A. The Nature and Circumstances of Defendant's Crimes and the Need to Reflect the Seriousness of the Crimes.........7

B. Need to Provide Adequate Deterrence to Criminal Conduct..............................................10

C. Need to Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Sentence Disparities...11

D. Restitution and Supervised Release......................11

V. CONCLUSION...........................................12

# TABLE AUTHORITIES

PAGE(S)

**CASES:**

United States v. Johnson,
529 U.S. 53 (2000) .................................... 12

United States v. Goff,
501 F.3d 250 (3d Cir. 2007) ............................ 11

United States v. Treadwell,
593 F.3d 990 (9th Cir. 2010) ........................... 11

**STATUTES:**

18 U.S.C. § 1028A ...................................... 6, 10

18 U.S.C. §§ 1343, 1344(2) ................................ 5

18 U.S.C. § 1957 .......................................... 5

18 U.S.C. § 3553(a) ....................................... 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant is a con man and a predator. He develops romantic relationships with his victims and then, exploiting the intimacy and trust he cultivates, lies to them to get their money. He presents himself as a successful businessman and makes himself look wealthy by driving fancy cars (leased in other people's names) and flashing account statements showing multi-million-dollar balances (which are fake). He cloaks himself in an aura of honor and respectability by claiming to be a military veteran who has served in Iraq and Afghanistan (he is not and has not). The picture-perfect self-image defendant presents is a tissue of lies, but once he induces his victims to believe it, he solicits money from them using more lies and false promises, for instance that he will pay the money back or will invest it on the victims' behalf. Defendant never repaid or invested the money as promised and, instead, spent it on himself.

Defendant's scheme caused losses of more than $1.4 million to 19 victims. But the harms defendant caused go further than these significant financial losses. The harms include the serious emotional damage, described in detail in the accompanying victim impact statements, which defendant inflicted on his victims. Most of defendant's individual victims were women he began dating, encouraging their affection only to exploit it and leave their self-esteem, as well as their finances, in tatters. The Court should impose a sentence that reflects the full scope of the harm defendant inflicted and deters others from engaging in similar schemes. Nothing less than the high end of the applicable United States Sentencing

Guidelines ("Guidelines" or "USSG") range, or 71 months, is sufficient to accomplish these goals.

**II. DEFENDANT'S SCHEME TO DEFRAUD**

For over six years between 2014 and 2020, defendant defrauded women with whom he engaged in romantic relationships. He met many of his victims by chatting them up where they worked or through mutual acquaintances. Relying on the intimacy he had established with his victims -- and on the false image of success and respectability he had manufactured through his lies -- defendant would ask his victims for money.

Sometimes, defendant asked for "loans." He would promise to repay these "loans" quickly, and the victims believed his promises because he had deceived them into trusting that he was wealthy, creditworthy, and responsible. He would claim that he needed the loans for very specific purposes, which also reassured the victims -- again, falsely -- that they would certainly be repaid. For instance, defendant frequently claimed that he needed the loans for his businesses and that the businesses would swiftly return significant profits, which would free up money to pay back the loans. Sometimes, defendant would prey on the affection he engendered in his victims through his lies by claiming that he needed the loans to pay his medical bills, including for treatment he was supposedly receiving for cancer he supposedly had. In fact, defendant did not use the money as he promised he would and did not repay the loans. Instead, defendant used the money to fund his lifestyle.

On other occasions, defendant solicited money from victims that he promised to invest on their behalf in a particular manner, e.g., in bitcoin or a housing renovation business. Rather than investing

the money as promised, defendant would, again, spend the money on himself.

In addition to cash, defendant would obtain other things of value from the victims, specifically, cars, apartments, and credit cards, based on false representations. He would represent to the victims that his credit was tied up in other financial ventures and persuade them to allow him to lease the cars and rent the apartments in the victims' names by assuring them that he would make the required payments on the cars and apartments. In fact, he did not make the payments and his victims ended up holding the bag. When two of the victims stopped giving him money, defendant opened credit cards and obtained a line of credit in their names without their authorization and knowledge. He then charged thousands of dollars' worth of purchases and used the funds for his personal expenses. When defendant didn't pay for any of the charges, the victims were on the hook and their credit histories were compromised. The financial institutions ultimately bore the loss.

The Presentence Report ("PSR") details the ways in which defendant defrauded each of his victims. In sum:

<u>Victim J.L.</u>: Defendant induced J.L. to use her credit to obtain $42,000 worth of electronics, furniture, and other goods and to lease a $76,000 BMW, all of which he promised to pay for but did not. (PSR ¶¶ 21-22.)

<u>Victim M.B.:</u> Defendant persuaded M.B.'s parents to "lend" him $20,000 and M.B. to add him to her credit cards and let him use her personal information to sign an apartment lease, again falsely promising to make all the required payments. (PSR ¶¶ 23-25.)

Victim M.G.: Defendant tricked M.G. into sending him $582,000 as purported "loans" for his purported businesses. In fact, he used the money to pay for personal, often extravagant, purchases; his children's tuition; and some lease payments for the BMW he had obtained using victim J.L.'s name. M.G. lost this money and suffered other financial consequences as a result of defendant's scheme and has had to file for bankruptcy. (PSR ¶¶ 26-31.)

Victim J.Q.: Defendant cajoled J.Q. into sending him money from her IRA for defendant to supposedly invest in bitcoin on J.Q.'s behalf. He immediately spent the money on himself.[1] (PSR ¶¶ 32-33.)

---

[1] Defendant paid some money back to Victim J.Q. The government's restitution figures give defendant credit for $8,000, which is the amount of the cashier's checks from defendant that were deposited into J.Q.'s bank account. J.Q. does not remember the precise amount she received but believes it may be between $13,000 and $15,000.

Defendant recently provided screenshots of text messages between J.Q. and a third party and a recording of a phone conversation between defendant and a different third party that defendant contends demonstrate he paid J.Q. back everything he owed her, i.e., the full $61,452 he obtained from her for the purported bitcoin investment.

The text messages and the recording do not support defendant's contention. Setting aside that the dates of the text messages and recording, the identities of the third parties involved, and their motivations are all unknown, the communications -- even taken at face value -- nowhere establish that defendant paid back the full $61,452.

In the text messages (reproduced here as written), J.Q. states, "I had someone try to get my money back because I was so scared of him. He would call em and say he loves me and send me videos and I was terrified of him. I don't know what happened between him and the guy but I never got any money back. I needed that 60k to put back into my IRA account because I had a deadline. Otherwise I was going to get penalized by the irs another 30k -30% on top of the 60k." The unknown third party then says: "I get it but do you realize he gave this guy money he made payments to him he really tried to save face with you he told me he was hurt by you not trusting him." J.Q. responds "It's so much to explain - but he's full of shit he knows exactly what he did to em and the other girls. Same thing to each just a little different." When the third party says, "But he paid someone you told him to," J.Q. replies: "your missing the point. Whether he paid that guy or not idk [I don't know] I never got my money." The third party asserts that there is "evidence that the person you told him to pay was indeed paid" but there is no support

*(footnote cont'd on next page)*

Victims M.H. and K.H.: Defendant persuaded M.H. to give him $60,000 for a supposedly can't-lose investment opportunity and another $20,000 as a "loan" to pay for cancer treatment he was supposedly undergoing at Cedars Sinai hospital. He persuaded K.H., who is M.H.'s daughter, to give him another $60,000 for the investment and $25,000 as a "loan" for his purported cancer treatment. The investment opportunity was bogus, and the "loans" were never repaid. Defendant also opened bank/credit card accounts in M.H.'s name, made unauthorized purchases, and did not pay the credit card balances. (PSR ¶¶ 34-36; 37-39.)

Victim N.H.: Defendant convinced N.H. to lend him $11,000 to pay for a supposed business trip. He never took any such trip, and never repaid the loan. He used N.H.'s name, social security number and date of birth to get a $25,000 loan from USAA and two credit cards in N.H.'s name. Defendant did not repay USAA, and busted out (i.e., charged the maximum available balance and failed to pay it) the credit cards. (PSR ¶¶ 40-41.)

Victim D.W.: Defendant promised to make the payments on a BMW that he persuaded D.W. to lease in her name for him to use, but he didn't. He opened credit cards in D.W.'s name without her permission and ran up balances he didn't pay. (PSR ¶¶ 42-43.)

For this conduct, defendant was charged with multiple counts of wire fraud, bank fraud, unlawful monetary transactions, and aggravated identity, in violation of 18 U.S.C. §§ 1343, 1344(2), 1957

---

for that assertion or that any payments defendant may actually have made reached the full amount ($61,452) that defendant owed to J.Q.

The recording also fails to establish that defendant repaid J.Q. in full. Defendant states that "everything was paid," but offers no evidence to support his self-serving assertion.

and 1028A, respectively. (Indictment (Dkt. 1).) Pursuant to an agreement with the government, defendant has resolved his case by pleading guilty to one count of wire fraud and one count of unlawful monetary transactions. (Plea Agreement (Dkt. 57).)

## III. THE PSR AND DEFENDANT'S SENTENCING GUIDELINES RANGE

The PSR calculated defendant's offense level under the Sentencing Guidelines by starting with a base offense level of 7 and then applying a 14-level enhancement because defendant caused losses to his victims of $1,411,926.51, the amount of money he convinced his victims to give him outright as purported loans and investments in his companies and the unpaid balances on the credit cards and leases he obtained through fraud. (PSR ¶¶ 56-59.) The PSR also added a 2-level enhancement because defendant's offense involved more than 10 victims; a further 2-level enhancement because the offense involved the use and transfer of means of identification (e.g., names, social security numbers) to obtain loans and credit cards, and a one-level enhancement because defendant was convicted under 18 U.S.C. § 1957. (PSR ¶¶ 60-66.) After applying a three-level reduction for acceptance of responsibility, the PSR calculated defendant's total offense level as 23. (PSR ¶¶ 70-74.) Defendant has stipulated that this calculation is correct, with the exception that defendant believes that the losses caused by his offense conduct are between $250,000 and $550,000 and therefore only a 12-level adjustment for loss applies. (Plea Agreement (Dkt. 57) at paragraph 14.) The government agrees with the PSR's offense level calculation and has no objections to the PSR.

With a total offense level of 23 and a criminal history category of III, defendant's total Guidelines range is 57 to 71 months'

imprisonment. (PSR ¶¶ 79-80, 134.) For the reasons discussed below, the government recommends a high-end Guidelines sentence of 71 months' imprisonment.

## IV. THE COURT SHOULD IMPOSE A SENTENCE OF 71 MONTHS' IMPRISONMENT

An examination of the sentencing factors under 18 U.S.C. § 3553(a), in particular the nature and circumstances of defendant's crimes and the need to provide adequate deterrence, demonstrates that a serious custodial sentence is necessary to address defendant's criminal conduct. A high-end sentence of 71 months is sufficient, but not greater than necessary, to achieve these goals.

### A. The Nature and Circumstances of Defendant's Crimes and the Need to Reflect the Seriousness of the Crimes

To begin, defendant's crimes were very serious. Standing alone as a financial fraud, the actual loss amount of over $1.4 million makes them serious crimes. But it is the emotional impact that defendant's fraudulent conduct had on his victims that makes it particularly egregious. Defendant not only conned people out of their money, he did so by betraying their trust after forging intimate relationships with them. The impact of such a fraud is more than financial; it is personal, as painfully illustrated by the victim impact statements ("VIS") lodged under seal. For example:

- One victim reports that she "live[s] in constant fear of the utter humiliation" she would feel if "someone discovers what [she] went through." (VIS at 2.) She describes "work[ing] so hard to forget or work past" the pain defendant inflicted so that she can "hopefully become a whole person again." (Id.) Since being victimized by defendant, she has "mostly stayed home or worked, trying to

rebuild [her] life and sense of well-being." (Id.) This victim reports that she "lost my home and had to declare bankruptcy." (VIS at 5.) Worse yet, "his emotional and verbal abuse" led the victim to "devalue my self-worth to the extent that I was becoming suicidal." (Id.) The victim also describes severe medical issues that she attributes to her interactions with defendant. (VIS at 6.)

- A second victim writes of the devastating consequences of defendant's crimes: "I am over $100,000 in debt, I can't open up a bank account in my name, my credit has gone to shit and I have zero in savings!! I will not be able to buy my own home, open up a credit card, or buy another car for that matter. . . . I have no money left for me in my 401K, no savings left, and I owe the IRS for that money that I took out. I have since lost my job." (VIS at 14.) These financial harms lead to more personal harms: "I have low self esteem, depression, and anxiety.. all which I never had before. I have gained 35 pounds and I hate myself!! I was suckered into believing someone who I thought was a friend of mine for 5 years. [H]e made me believe I could trust him. He made me promises, he played me!! I am a fool for being so naïve!! I never ever thought something like this would happen to me. [H]e is so good at lying! He stole from me! He ruined me!" (Id.)
- A third victim describes the emotional impact of defendant's crimes: "Do you have any idea HOW HORRIBLE I feel as a Mother and Grandmother not to be able to afford to buy my children and grandchildren Birthday or Christmas

gifts?" (VIS at 10.) Defendant's lies about his purported military service were particularly painful: "My grandson served a tour in Afghanistan and Niger, Africa that had very challenging moments! HOW DARE Ze'Shawn!" (VIS at 9.) This victim volunteered for the American Veterans Assistance Group and arranged for a Quilt of Valor to be made for him. (See VIS Exhibit A.) She was "EXTREMELY mortified" because the organization "could have utilize[ed] their time and energy to a Veteran that DESERVED it." (VIS at 9.)

- A fourth victim lists the damage defendant caused, which was especially harmful because she is a single mother trying to take care of her child: Defendant "calculate[d] and fully intend[ed] to damage a mother and child's life with no remorse." (VIS at 17.) Defendant "didn't hesitate" to take money needed for the child's tuition and the mortgage. (Id.) The devastation included "[t]aking out loans in my name and leaving it to me to pay back. Just leaving a path of destruction to a mother and child that did absolutely nothing to you but care about you when you lied about a brain tumor." (Id.)

These heart-wrenching accounts by the victims capture the harms that defendant's fraud caused in a way that the Guidelines simply cannot. Nothing short of a high-end Guidelines sentence would suffice to account for the nature and circumstances of defendant's crimes. Moreover, in the course of his fraud scheme, defendant committed additional crimes such as aggravated identity theft, by stealing the personal identifying information of his victims and using it to open

credit cards on which he incurred charges that he had no intention of paying. As the Court is aware, a count of aggravated identity theft under 18 U.S.C. § 1028A carries a mandatory two-year consecutive sentence. The government's agreement to forego that charge in the plea agreement was a significant benefit that reflects the value of defendant's early decision to accept responsibility. Defendant deserves no further leniency. The Court should therefore impose a high-end Guidelines sentence in order to adequately reflect the seriousness of defendant's crimes.

**B. Need to Provide Adequate Deterrence to Criminal Conduct**

Romance scams are schemes in which the perpetrator creates an illusion of a romantic or close relationship with a victim in order to manipulate and/or steal from the victim. According to the FBI's 2021 Internet Crime Report, in 2021 the FBI's Internet Crime Complaint Center (IC3) received reports from 24,299 victims who experienced more than $956 million in losses from Confidence Fraud/Romance scams. The FBI reports that his type of fraud accounts for the third highest losses reported by victims.[2] The numbers have been skyrocketing, having tripled since 2018, when the losses from this type of scam were approximately $362 million.[3] These scams remain a significant problem, likely exacerbated by the isolation and on-going social upheavals caused by the COVID-19 pandemic.[4]

---

[2] https://www.ic3.gov/Media/PDF/AnnualReport/2021_IC3Report.pdf at 12.

[3] https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf at 22.

[4] The 2022 Internet Crime Report, which was just published, reports 19,021 victims of confidence/romance crimes suffering losses of $735,882,192.

While the United States' efforts to address romance scams have seen success through robust prosecutions, that success is dependent on sentences adequate to deter con men in the first place and to keep offenders like defendant in custody long enough to keep the public safe. A 71-month sentence would appropriately accomplish that end here.

**C. Need to Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Sentence Disparities**

Defendant's fraud offenses evince a clear lack of respect for the law. A high-end Guidelines custodial sentence is therefore necessary to promote adequate respect for the law. A high-end Guidelines sentence would also provide just punishment and avoid unwarranted sentence disparities with similarly situated defendants. See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) (court can rely on correctly calculated Guidelines range to avoid unwarranted sentencing disparities); United States v. Goff, 501 F.3d 250, 258 (3d Cir. 2007) ("Part of 'just punishment' is the avoidance of unwarranted sentencing disparities.").

**D. Restitution and Supervised Release**

In addition to a high-end Guidelines term of imprisonment, the Court should impose a restitution order and a period of supervised release. As discussed in the PSR, defendant caused losses to his victims in the total amount of $1,414,926.51. (PSR ¶ 146.) The Court must impose a restitution order requiring defendant to pay that amount in full to his victims, as specified in the PSR. (Id.)

To protect the community and to ensure that defendant pays off his restitution order to the best of his ability once released from custody, the Court should also impose a three-year period of

supervised release. Such a term of supervision will also provide defendant with oversight and supervision as he attempts to become a law-abiding and contributing member of society following his release from imprisonment. See United States v. Johnson, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life."); S. Rep. No. 98-225, at 124 (1983) (describing the "primary goal" of supervised release as providing "rehabilitation").

**V. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of: (1) 71 months' imprisonment; (2) a three-year period of supervised release; (3) restitution in the total amount of $1,414,926.51, as described above; and (4) a mandatory special assessment of $200.